The case this morning is 2018-1295, Natural Alternatives v. Creative Compounds. Mr. Bell, please proceed. Good morning. May it please the Court. My name is Kevin Bell. I represent Natural Alternatives, the appellant in this matter. In the great brief, I'm just housekeeping really, in the great brief at page 23-04, you argue the 947 patent is part of this appeal because, quote, Creative brought the eligibility of that patent into question. But in your complaint, you didn't assert the 947 against any of the defendants involved. It's only in a different civil action, right? Your Honor, the 947 patent was asserted in an earlier filed case against a company called Allmax Nutrition. It is in this opinion because it was asserted against the other defendant, Hitech Pharmaceuticals and their related entities. So it's part of this appeal? As I said, this is a housekeeping question. And a fine question, I believe. It is not a patent that was asserted against Creative Compounds, the appellee in this case. By virtue of the fact that we appealed the District Court's order and it was incorporated, it's been argued in this appeal, whether or not you have to pass judgment on it, I think is a decision that the Court can make. But it is not a patent that was asserted against Creative Compounds. So the District Court's judgment said all of the claims against all of the parties in this action have been resolved. So isn't it proper to read that judgment is not invalidating the claims of the 947 patent? Well, the 947 patent was asserted against the other defendant in another case, but it was the motions were argued on the same day and issued one opinion. So the one opinion addressed both defendants and all of the patents? That's correct, Your Honor. What's the status of the Hitech litigation? The Hitech litigation, originally there were other claims involved in that case, so it proceeded on other claims. However, the owner of the company in that case came under federal indictment by the FDA for selling adulterated products, and the government seized all of his records. So that gave us a convenient way to stay the case for a period of time, I guess, because he had nothing to produce a discovery. That case is currently, we've had status comments with Judge Huff in that. We eventually reached a point where she was encouraging us to try to dismiss the case, but there's a dismissal with the right to readdress, to bring that case back. So it was dismissed? It has been dismissed, but it has conditions upon being able to come back. Not dismissed with prejudice?  I see. It's an interesting set of facts. That's why it was an outstanding question. We didn't have to argue about electronic discovery, which was a plus. The appeals court, natural law attorneys believe that really this case can turn upon a discussion of step one of the Alice Mayo analysis. We believe there were meaningful limitations, at least about five, ignored by the district court. Any of these meaningful limitations, and certainly the multiple ones that were ignored by the district court, would have ended the analysis under step one. I can provide you with those limitations and discuss them, because I think that would be beneficial, because what we believe is that the court, the district court really decided to say the focus is on bait outing. But what we don't believe is that she looked at the focus on the claim as a whole. She looked at the focus on the claim as a whole, as is required. We believe that the other limitations and steps involved in this family of patents would have resulted in a different result. We also have a claim construction here that's been stipulated to, and while the judge said she adopted it, it doesn't appear that it was applied. But in any event, we feel that the district court felt it adequately to consider at least five meaningful claim elements. Would you explain something to me? Yes. In the 596 patent, table seven depicts a chart of maximal voluntary isometric contraction. What is maximal voluntary isometric contraction force, and how does it measure carlanosine synthesis? Your Honor, I'm going to plead this to you right now. You've picked the one person that is the political science major. To answer that question. No, your client did. Correct. So you're going to explain it to me, right? I will find a way to more accurately explain that definition if I can, Your Honor. To you, if I could, in just a bit. You can do it on your response. Thank you. The effective, or the meaningful claim elements that we distinguish were not considered by the district court are the following. The fact that this is a supplement that is provided to humans, not other mammals. It is a dietary supplement, and in the form that is given to humans, giving them effective amounts of things, which would involve various doses. Well, let's look at claim one of the 084 patent. And the question is, what are the claims directed to? So claim one of the 084 patent would be a human dietary supplement. So it's a supplement taken by humans. It provides a dosage regimen to be taken with a range of programs. So you have the supplement, and it comprises a beta-alanine. And I think we can pretty much say that that's a natural substance, correct? I think we can say that that is a substance that may naturally occur in the body and the liver. Okay, good. So it's a natural substance. It occurs in the body and the liver. Then we have a unit dosage of this natural substance. It's between 0.4 grams and 16 grams, which seems to be a pretty wide spread. There's no specificity there, but it's a wide spread. But either way, whether you have 0.0001 grams or you have 1,000 grams of this substance, it's still a natural substance. Beta-alanine is really the natural supplement, if you will, here. Beta-alanine is really the development of carnosine. But we're looking at the claim. I understand. Okay. So, so far, and you're with me that this is a natural substance, and you have either a handful of 0.4 grams or you have 16 grams of it. It's still a natural substance. Nothing's changed. We're in the supplement provides a unit dosage of the substance. Just out of curiosity, I definitely want you to answer Judge Raina's question, but does a human liver, a single person's human, does any human being have 0.4 grams of beta-alanine in their liver? I believe so, Your Honor. No, the answer is actually no. No political scientist. Sorry. Anyway, keep going. I'm sorry, Your Honor. So what do you say, I mean, just looking at that, that this particular claim is directed to a natural substance? That's all it is. No, Your Honor, I believe these claims are directed toward. No, claim one. I understand. Okay, claim one. I believe this is, claim one is directed to a dietary supplement that includes the. It doesn't say that. It's a dietary supplement comprising the whole thing is a beta-alanine, which we say is a natural substance. And, again, whether you have a pound of it or 50 pounds of it, that doesn't matter. It's still the natural substance. Well, that would not be a natural substance in an effective amount to create. This doesn't talk about, claim one does not talk about an effective amount. It doesn't talk about. No, Your Honor, but I believe you have to read the claim in light of the specification. So, I mean, I think when you talk about how you take these and what effective amounts are, if you look at the specification, you're going to find in there places where one of the ordinations is going to be hard. Well, you know, I realize that the specification comes into play, but step one of ALICE is that what is the claim directed to? And here it's directed to beta-alanine. It is directed to a dietary supplement provided to humans instead of other mammals or animals or other things. And it is something that is put into a product that is a dietary supplement. It doesn't say any of that here. I don't think it has to say that in the actual claim language as to what the form of a dietary supplement it is. It is an ingredient in a dietary supplement that when taken and ingested then goes into the body and mixes with L-histidine to create carnosine. Well, can I question something? The word effectively is in there. You asserted a definition for what effectively meant, which is that it has to increase carnosine content in the muscle consistent with the specification. And the district court in this case said, unless I'm mistaken, that she would accept all of plaintiff's claim constructions for purposes of analyzing. So I think at this stage, whether I agree with that claim construction or not, the district court's decision is based on that as well as your asserted construction of dietary supplement, right? That's correct. So all those limitations are in this claim as decided by the district court below. Whether I would agree they should be or not, that's not the issue. That is correct. Everybody agreed that these are the limitations to be applied for purposes of this motion. That is absolutely correct. Do you want to save the rest of your time for rebuttal? Well, I'll just point out the additional limitations that were in the claim. It's provided to humans in the form of a dietary supplement. It is an effective amount that must naturally require doses. An effective amount has to require a certain amount over a period of time. And I think those are the most relevant limitations that you have here. Well, and in the 376 claim, you add glycine, and there's testimony and articles that glycine in combination with an amino acid like beta-alanine increases efficacy. Isn't there in this record? Yes. So that's another limitation of a different. We were talking mainly about what is, quite frankly, your hardest claim, the 084. But there are other claims at issue here in front of us that have more detailed and narrow limitations. That's correct, Your Honor. I will reserve the rest of my time. I don't want to waive any arguments, which I think are already in the briefs. You can't waive arguments in oral argument. Don't worry about it unless you affirmatively waive them. Okay, Mr. Roche. Good morning, Your Honors. May it please the Court. All of the claims at issue here begin and end with beta-alanine. In the red brief at 44, you argue that this Court has never granted Skidmore deference to the PTO's guidance document. There's no reason to start doing so now. Yes, sir. In Christensen v. Harris County, the Supreme Court explained that Skidmore deference is applied to, quote, interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law. Why are the eligibility guidelines different from those interpretive documents that are afforded deference? I think that certain documents from the PTO, eligibility documents, may be subject to Skidmore deference. I think certain decisions or directions... They put it out to the public. They do. They put it out to folks who draft patent claims like myself, and they put it out to the examiners as well. However, I think that these particular guidelines, and again, they change, of course, over time. Most recently, the PTO issued new guidance based upon this Court's vanity decision from last year, for example. Very recently, the 2019 guidance came out, and that is, I dare say, fairly different in this particular context. And that's, I think, part of it. What about Carnegie, Mill, and B. Hoffman? We don't cite Skidmore, but we held PTO guidance on 112's written description requirements are persuasive in authority. Certainly persuasive, yes, Your Honor. And again, it's not something to be ignored. And Skidmore is the power to persuade. I think it's more than the power to persuade in fairness, Your Honor. I think any deference such as Skidmore deference is perhaps heightened persuasion, let's say, for lack of a better way to say it. And obviously, I'm surprised, Your Honor, and I don't think that you agree with me, and I understand that. Nevertheless, I think that the deference spoken of... To paraphrase Justice Holmes, the power to persuade is the power to destroy. Well said, of course, Your Honor. Not looking to destroy anything here. Nevertheless, I think that these particular guidances, this particular guidance is subject, in this context that we have before us, is particularly problematic for several reasons. First, of course, we know that the PTO applies to one's reasonable interpretation, whereas the court, such as the district court here below, does not. Why, in step one, why didn't the red brief discuss Vanda Pharmaceuticals? It was decided a couple of months before you filed the red brief. Your Honor, I wrote the red brief, and I will stand here and tell you, I didn't. Are you familiar with it now? I am. What do you have to say about it? I think that... Why doesn't Vanda control the outcome here? I think this case is closer to Mayo, and in particular, Ariosa, than it is to Vanda. In Vanda, the majority, which of course, the majority was that beta-alamine supplementation inhibits growth of cancer cells. Wouldn't that be patentable? I know this isn't going to be a popular answer, Your Honor, but I'm going to have to say I don't believe it would be. Would that, in that example, would that dosage be administered to somebody other than a cancer patient? I want to make sure I understand your question, Your Honor, if I may. If, for example, a patent said dose 16 grams of beta-alamine to a patient who is not suffering from cancer, by the way, we happen to know that this would cure cancer. Is that fair? No. As I said, in Vanda, the medication was directed to a specific individual, somebody suffering from schizophrenia. Here, there's nothing here that I can see, or am I correct about this, this applies to any human. That is correct, Your Honor. So it's not a specific patient, or a... Correct? You are absolutely correct, Your Honor, where the Vanda majority distinguished male on the specific point that it is, quote, that the claims in Vanda are, quote, directed to a novel method of treating a disease. Again, a specific human suffering a specific condition. Whereas in male... But wait a minute, on page 28, spanning 29 of your red brief, you clearly say that even if it was discovered that beta-alamine could cure Alzheimer's, such a discovery would not be eligible, according to you. Yes, Your Honor? So your answer to Judge Reyna's question, I think, as I understand it, would be even if it was discovered that beta-alamine could inhibit tumors in cancer patients, it would not be eligible. Is that right? Unless there was something more to it. Yes or no? No, it would not, Your Honor. Just that, no, it would not. No, that would not be eligible. You could not write a claim that says inhibiting tumor growth in cancer patients using beta-alamine. You would say that's not eligible. That is correct, Your Honor, that's what I would say. That's possibly a step too far. I think that if we look at the CellsDirect case, we can get some guidance here. You want us to go a lot further than Mayo went and to disregard Vanda to get to where you want us to go. Your case isn't decided by Mayo. You want us to go a little further down the Mayo road. And you want us to distinguish Vanda. Is that fair? Yes, well, I think the second part is fair, Your Honor. I think the case does not, I'm not looking to go further than Supreme Court went in Mayo. I think that Vanda is distinguishable. Okay, so distinguish it. Okay, the case in Vanda, it was directed to a new use. As the majority there said, it was directed to, the claims were directed to, a new way of using an existing drug. Whereas Mayo, according to the Vanda court, would optimize an existing natural phenomenon. That's what we have here, Your Honor. We are optimizing an existing natural phenomenon. Beta-alamine exists in nature, we've all agreed to that. It naturally creates carnitine, it naturally obviates tiredness when you're working out. No one disagrees with any of that. It's all a natural process. All that the inventors here discovered was, if I simply give you more beta-alamine, it turns out that your body will not suffer homeostasis as it does in many situations, in many contexts. With many drugs, with many other natural compounds. But instead, it turns out, we've discovered, your body goes past homeostasis. Now, that's not a unique, entirely unique condition. Other compounds cause the body to go beyond homeostasis. And all that they have said was, oh, it turns out we discovered that this is one of those compounds that does that. Well, that's a natural phenomenon, Your Honor. All this is, is dosing and optimizing, much like they did in mail, or the claims in mail. So, as the majority said, in Vanda, where mail is an optimization case, Vanda is a new way of using an existing drug. We are an optimization case. But the court in Vanda was very clear to that. It involves sampling, genotyping essays, and then specific dosages that depend on the genotype of the patient. Yes, all that was in the claims. Do any of the claims here depend on the genotype of the patient, or any specific characteristic of the patient? Maybe a patient that wants to have a little bit more strength in their muscles, but... I think it's a patient who would like to offset fatigue, rather than... I might say it a slightly different way, but I agree, Your Honor. Anyone of us can take Carnosyn. Anyone in the room can take Carnosyn, and we're going to have the exact same effect, because it happens the same way in human beings. There's nothing unique. And there's certainly nothing directed to your point, Your Honor. There's nothing in the claims directed... Or in the specification, I might point out, because of course we should look to the written description in the context of the Step 1 of the analysis. There's nothing in the written description either that says a specific human suffering from a specific condition. Unlike in cases like Vanda, for example, where it was very specific. Again, CellsDirect is another case that I think is easily distinguishable, where this court found that there was not a one-on-one ineligibility, because in CellsDirect, while they did discover a natural phenomenon, they used that discovery to create a brand new laboratory technique. And that was the basis in CellsDirect for finding that the claims were not patented. In the red brief at 41, you say that the dietary supplement with beta alanine to increase the levels in muscle tissue only uses admittedly conventional activity. Yes, sir. And you cite to the 610 patent in Column 1, lines 41 to 44, which says natural food supplements are typically designed to compensate for reduced levels of nutrients in the modern human and animal diet. In particular, useful supplements increase the function of tissues when consumed. What part of that language do you think admits that the patents in suit employ only conventional activity? If I may have just a moment, Your Honor. Yes, sir. Thank you. That's why I read it to you. And that was helpful, Your Honor. I don't want to deny that, but it's always nice to have it. Well, I think that is the typically designed language there. I think there may probably, in fairness, be better citations elsewhere in the 610. So without further factual... Based on what you cited me to, without further factual development of the record, how do we know whether the doses claimed are enough to create an unnatural increase? Keranosine, I believe. Keranosine synthesis. Do we have any evidence of what is an overloading dose of beta alanine? We don't have any evidence outside of what I've put in here and what is in the district court's decision, of course, regarding what is a quote, unquote, unnatural. Specifically, is it 0.4, for example, in the claim that was discussed in the opening argument? Or is it 16, or is it somewhere in there? There's nothing specific to that, Your Honor. While we certainly at this stage were not discussing indefiniteness issues, there is nothing specific to that or what is a quote, unquote, effective basis. Nevertheless, although I think Your Honor may have wanted to follow up... Well, again, on facts. And that is, at 39 in the red brief, you say the fact that there is a direct link between Keranosine concentration levels on the one hand and the amount of beta alanine administered and the amount of time over which the administration, on the other hand, confirms this is a natural phenomenon. What evidence supports that assertion? Why wouldn't you need a fact witness to support that sort of assertion? Because I think that the patent specification... And it's a shared specification for the most part and certainly in the substantive context. So I'll say the patent specification addresses this to a great extent. For example, the 596 patent at column 5, lines 4 to 35, which is appendix 659. So lines which? It was lines... And I've been bringing myself there as well. There's a long discussion here of how the beta alanine histidine dipeptides are synthesized within the body. And it goes down into, for example, at line 27, the synthesis and accumulation in a human or animal body can be increased with an increase in the content within the body and creatine goes on in the next period of blood plasma concentrations can be increased by ingestion or infusion of beta alanine, L-histidine, creatine or active derivatives thereof. So I think that the patents themselves and quite frankly I don't think there's any significant dispute here about this amongst anyone, amongst the parties even that if you ingest beta alanine carnosine is the natural result. But if you add glycine, the carnosine increases even more, doesn't it? That's my understanding, yes. So why wouldn't that take us outside of Parker v. Fluke because you have a combination of drugs that is together causing a greater reaction than any one of them could have caused individually. So unlike Parker... I think it's Parker v. Fluke... Just say it out loud. Funk Brothers, thank you. Unlike Funk Brothers where you just took two bacteria and stuck them together and the only invention was they could be given together in one shot here you have two different products, both of which are going to act together to cause a result that is greater than they could otherwise. So why doesn't this take us outside the parameters of Funk Brothers? I don't think we have evidence that if I took...  which was attached to the Hoffman Declaration which expressly says the addition of glycine increases and other kinds of insulin increases the effectiveness of amino acids and it expressly says including beta alanine. So what we have here is at least a fact argument presented in evidence before the judge at this pleading stage that says this combination does more than each thing individually would have done. Page 1063 of the J.J. Drama. Well I think and this is obviously specific to the 376 patent. Correct. Of course. No it's not because let's be clear the 084 patent has lots of defendant claims which had glycine also. Yes Your Honor, offhand I can't recall if they were asserted or not. They were asserted. For some crazy reason I will never understand they agreed to go on Representative Claim 1, which made no sense to me, but they did. So anyway, there are other claims asserted in this case that involve the combination with glycine as well. So why doesn't that take you outside of Funk Brothers? You can't possibly tell me, do you, that Funk Brothers stands for the proposition that even when two things are put together and found to have a greater impact than either one could have individually, they're still ineligible? I'm not going to say that. Thank God. Nevertheless, I do think that we have to focus on... that that's the case here based on what I just directed you to. Wouldn't that prevent at least a judgment on the pleading with regard to the 376 claim? There were factual issues there and I do not believe it would direct us away from a judgment on the pleading. Why? Did you offer any contrary factual evidence or should a judge be deciding facts like that at the pleading stage? We did not and what I think that the judge did do and should do is look to what the claims are directed to and looking at the whole thing... Was the claim directed to a combination of glycine and beta-alanine? Yes, ma'am. And is there evidence at the pleading stage in this case that that combination results in greater efficacy vis-a-vis that particular article I directed you to which is in the appendix and was before the district court? There is evidence that the natural results, naturally occurring results... Would be greater, would be different, would be affected by putting these things in combination. Agreed, Your Honor. However, again, that's naturally occurring results. If that's your argument, then any two elements put together in any pharmaceutical compound cause the natural result of putting those two elements together in a pharmaceutical compound and therefore all pharmaceuticals are now ineligible, if that's your argument. No, Your Honor. Because when you put two things together and they cause something different than when they would each cause individually, that has to be eligible. I would generally agree, yes, Your Honor. With the only caveat being, of course, a stuck tube, I guess. No, I get it. Okay. Thank you, Your Honor. Thank you for your argument. We have some rebuttal time. Often is the case as to when you try to decide when to lay down your sword instead of on your shield, as opposed to stand back up on your bottle top. In other words, you're going to sit down now? Pretty close. I wanted to make sure that... Your Honor, I gave you your maximum contraction question. In layman's terms, it's essentially a person flexing a muscle for a period of time. Okay, thank you. Excellent. Okay, I thank both counsel. The arguments are taken under submission.